CPR
7-29-14

UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF MARYLAND

AUG 2 5 2014

AT BALTIMORE
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ DEPUTY

| | | |
|---|---|---|
| IN THE MATTER OF THE SEARCH OF | ) | **14-1700SAG** |
| 8 FALLS CHAPEL WAY | ) | Misc. No._____ |
| REISTERSTOWN, MD 21136 | ) | |
| | ) | |

### AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

Brian J. Pruitt, a Special Agent with Homeland Security Investigations, being duly sworn, deposes and states:

1.      I am an agent employed by the United States Department of Homeland Security, Division of Homeland Security Investigations (HSI).  As such, I am a law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7); that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 21, United States Code.  I am also a Title 21 cross-designated officer, empowered by the Drug Enforcement Administration to conduct drug investigations.

2.      I have been a Special Agent with HSI since October 2008 and as part of my employment with HSI, I attended the Criminal Investigator Training Program, a twelve-week basic program for all federal criminal investigators held at the Federal Law Enforcement Training Center ("FLETC") in Glynco, Georgia.  I also attended Special Agent Training, an additional twelve weeks of training held at the FLETC.  During both of these courses, blocks of instruction were

1

given on such subjects as basic investigative techniques, federal controlled substances and firearms laws, immigration law, types of controlled substances and recognition, methods of manufacture, distribution and sale, money laundering techniques, electronic and physical surveillance techniques, and application of constitutional law. I was previously employed by the United States Coast Guard for 12 years as a commissioned officer and was assigned to a specialized unit whose mission was to detect and interdict drug traffickers on the United States Territorial Seas and the High Seas.

3.      Since my employment with HSI, I have received specialized training in the area of drug smuggling and money laundering investigations and have participated in narcotics and money laundering investigations. I have conducted covert surveillance of suspected drug traffickers on numerous occasions, and interviewed numerous individuals involved in the drug trafficking trade. I have written search warrants and assisted in the execution of numerous state and federal search warrants. I have arrested numerous narcotics traffickers and assisted in the arrest of narcotics traffickers. I have participated in investigations resulting in the seizure(s) of multiple kilograms of marijuana, cocaine, heroin, U.S. currency, firearms, and other controlled substances. Based on my training, education and experience, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed, the methods of payment for such drugs, and the manner in which narcotics traffickers communicate with each other.

4.      During these investigations, I have examined records consisting in part of buyers' and sellers' lists, and pay/owe ledgers. I have conducted surveillance of numerous drug dealers. I have interviewed drug dealers, users and confidential informants and have discussed with them the life-style, appearance and habits of drug dealers and users. I have become familiar with the manner in which narcotics trafficker smuggle, transport, store and distribute narcotics, as well as



how they collect and launder drug proceeds.  I am also familiar with the manner in which

narcotics traffickers use telephones, cellular telephone technology, coded communications or

slang-filled telephone conversations, false or fictitious identities, and other means to facilitate

their illegal activities and thwart law enforcement investigations.

## I.    **Premises to be Searched**

5.    This affidavit is being submitted in support of an application for a search warrant for the

residence located at **8 Falls Chapel Way, Reisterstown, MD 21136** " in Baltimore County

Maryland, hereafter the ("SUBJECT PREMISES").  Based on the facts set forth in this affidavit,

I respectfully submit that there is probable cause to believe that there is presently concealed in

the SUBJECT PREMISES the items set forth in Attachment B, all of which constitute evidence,

fruits, and instrumentalities of, inter alia, violations of Title 21, United States Code, Sections 841

and 846, which prohibit the distribution, possession with the intent to distribute and conspiracy

to distribute and possess with the intent to distribute controlled substances.  Further description

of the SUBJECT PREMISES is provided below at ¶ 50 in section III "The Subject Premises".

6.    Because this Affidavit is being submitted for the limited purpose of establishing probable

cause for a search warrant to search the SUBJECT PREMISES, I have not included every detail

of every aspect of the investigation.  Rather, I have set forth only those facts that I believe are

necessary to establish probable cause for the SUBJECT PREMISES. The information contained

in this Affidavit is based upon my personal knowledge, state Title III intercepts, my review of

documents and other evidence, and my conversations with other law enforcement officers and

other individuals.  All conversations and statements described in this Affidavit are related in

substance and in part unless otherwise indicated.

## II.   **Background**

7.      In 2002 members of the Caroline County Drug Task Force began receiving information about Byron Sentral DRUMMOND (hereafter "DRUMMOND") concerning his involvement in a controlled substance trafficking organization operating in and around Maryland's eastern shore region.  The investigation of DRUMMOND originated from multiple sources of information, coupled with various investigative efforts directed towards DRUMMOND and his associates. Between the years of 2002 through 2013 numerous operations were conducted focusing on DRUMMOND which led to the arrest of DRUMMOND on several occasions, as well as the seizure of quantities of controlled dangerous substances.  These instances did not prove to inhibit his intention to further violate the Controlled Dangerous Substance laws of Maryland.

8.      In 2014 the efforts to investigate DRUMMOND expanded, as it became known through various sources, that DRUMMOND was operating in concert with several known subjects and others yet identified, to further his/their drug distribution enterprise.  This information also identified DRUMMOND as the director of this potential organization, known for the purposes of this investigation as the DRUMMOND organization.  Through years of separate investigations DRUMMOND and several of his associates have been identified to law enforcement as significant individual narcotics traffickers in the Caroline County area of Maryland, but recent investigative methods have been able to confirm that these subjects were working in tandem.

9.      On June 1, 2014, the Honorable Karen M. Jensen, Judge of the Circuit Court for Caroline County, Maryland, authorized a Title III interception for a cellular telephone line, (410) 463-5813 or TT#1.  Within this 30-day period of authorized interception, law enforcement reviewed hundreds of wiretap conversations indicating that Kyle Mauris CANNON, identified as the primary user of TT#1 for the majority of the interception, was actively distributing significant



quantities of heroin, powder and crack cocaine, prescription pills, as well as marihuana to several individuals in and around Maryland's eastern shore region, to include Caroline County, Maryland.

10.     On June 4, 2014, Judge Jensen authorized a Title III interception for the cellular telephone line known to be utilized by the DRUMMOND organization, identified as (410) 310-7227 or TT#2. Within this 30-day period of authorized interception, law enforcement reviewed hundreds of wiretap conversations indicating that DRUMMOND was actively distributing significant quantities of heroin, powder and crack cocaine, prescription pills, as well as marihuana, to several individuals in and around Maryland's eastern shore region to include Caroline County, Maryland.

11.     On June 5, 2014, Judge Jensen authorized a Title III interception for the cellular telephone line known to be utilized by Kyle Mauris CANNON, as he operated within the DRUMMOND organization, identified as (410) 200-6154 or TT#3. Within this 30-day period of authorization interception, law enforcement reviewed hundreds of wiretap conversations indicating that CANNON was actively distributing significant quantities of heroin, powder and crack cocaine, prescription pills, as well as marihuana, to several individuals in and around Maryland's eastern shore region to include Caroline County, Maryland.

12.     On June 16, 2014, Judge Jensen authorized a Title III interception for the cellular telephone line known to be utilized by the DRUMMOND organization, more specifically Byron DRUMMOND, identified as (202) 748-4541 or TT#4. Within this 30-day period of authorized interception, law enforcement reviewed hundreds of wiretap conversations indicating that DRUMMOND was actively distributing significant quantities of heroin, powder and crack cocaine, prescription pills, as well as marihuana, to several individuals in and around Maryland's



eastern shore region to include Caroline County, Maryland.

13.     Throughout this investigation investigators intercepted numerous telephone calls between DRUMMOND and many members of the organization to include Gary Tyrone KESS (KESS hereafter).  As set forth below, the telephone participants have been identified and the calls demonstrate that each member is involved in the ongoing conspiracy to distribute heroin, powder and crack cocaine, prescription pills and marihuana.  More specifically, KESS had been identified as the primary user of cellular number 347-461-6763.  KESS has also been identified through this investigation as being a source of supply of heroin to the DRUMMOND organization.  KESS supplied DRUMMOND on numerous occasions with large amounts of heroin and prescription pills to further the DRUMMOND'S  drug organization.

14.     The paragraphs that follow summarize several, but not all, of the intercepted conversations between DRUMMOND and KESS, along with other co-conspirators. Interceptions are designated by the telephone number, session number, time and the date on which they were monitored.  The interceptions that are listed below are direct representations of the communications made and or received.

15.     On June 14, 2014, at approximately 1445 hours, Maryland State Sr.Tpr. Abey and Tfc. Flamma were contacted by the monitor personnel that Byron DRUMMOND would be meeting an unknown male at the Park and Ride located at U.S. RT. 50 and MD RT. 404, Talbot County MD. The monitoring personnel also advised that Taylor GIBSON would be with DRUMMOND for this "Re-Up."

16.     On June 14, 2014, call activation number 3972 was intercepted.  The call was between Taylor GIBSON and Byron DRUMMOND.  During that call DRUMMOND advised GIBSON to meet him in Ridgely because "Yo" was at the park and ride.  DRUMMOND told GIBSON to

6



go to "Mr. Al's" and meet him there because he has to pick up change. A short time after this call Cpl. Nichols observed a champagne colored Cadillac and DRUMMOND'S Tahoe pull into the driveway of "Mr. Al's" located on Central Avenue in Ridgely, MD. DRUMMOND and GIBSON both entered that residence and a short time later left with GIBSON driving the Tahoe and DRUMMOND the passenger.

17.     On June 14, 2014, call activation number 3974 was intercepted. This call was between Kendall CANNON and DRUMMOND. During the course of this call DRUMMOND explained to CANNON that he purchased 100 grams of cocaine and the quality was good. DRUMMOND stated that he got so high off of it while at the hotel that he told his source with the "bobby" (heroin) to get out. DRUMMOND said the source had to go all the way back across the bridge with the "Bobby" and he is coming back today to give it to him.

18.     At approximately 1510 hours, S/Tpr Abey took a stationary position in a park-n-ride location,where he could clearly see the entrance from MD RT. 404 to the parking lot. At approximately 1510 hours, DRUMMOND'S blue Tahoe pulled into the park-n-ride and parked in the first parking spot. At approximately 1526 hours, S/Tpr Abey observed a Honda Odyssey van pull into the parking spot next to DRUMMOND'S blue Tahoe. S/Tpr Abey observed DRUMMOND exit the passenger side of his vehicle and approach the passenger side of the Honda. S/Tpr Abey was able to observe a brief transaction between the right front passenger in the Honda and DRUMMOND. This transaction lasted approximately 4 minutes.

19.     S/Tpr Abey then observed DRUMMOND leave the passenger side of the Honda van and get back into the front passenger seat of his Tahoe. The Honda van then exited the parking lot making a right onto west-bound MD Rt. 404 and then a right onto West Bound US RT50. As the Honda passed S/Tpr. Abey's location, he was able to identify two people in the vehicle. The

driver and a front seat passenger that was wearing a red hat and red shirt. This information was passed along to the other members of the surveillance team.

20.     S/Tpr Abey provided TFC Flamma with a description of the vehicle. TFC Flamma was stationary on west-bound US RT. 50 and observed the vehicle pass him. TFC Flamma was able to visually confirm this was the same vehicle as described by S/Tpr Abey using a photograph that was sent to him from S/Tpr Abey. TFC Flamma obtained the tag number of the vehicle (MD Registration A246367). TFC Flamma continued to follow the van until it was stopped by Tpr Z. Brown of the Maryland State Police Glen Burnie Barrack for a "Tint" violation.

21.     During the course of that traffic stop, Tpr. Brown identified the driver as being Gary Tyrone KESS JR, (B/M D.O.B 3/2/78), 8423 Merryview Dr. Windsor Mill MD 21244. The front seat passenger was identified as Tamiko Natee TAYLOR, (B/F D.O.B. 5/30/78), 9861 Bayline Cir., Owings Mills, MD 21117. KESS was released from the traffic stop, after he was identified and the appropriate traffic related paperwork was completed by Tpr. Brown.

22.     On June 16, 2014, at 2300 hours DRUMMOND, utilizing TT #4 sent an outgoing SMS message to 347-461-6763, which is utilized by KESS. This text was captured in call session number 79. The SMS messages read "150." It is believed that "150" refers to the quantity of heroin in grams, which DRUMMOND was going to purchase from KESS. Further, DRUMMOND stated that "ill be up dat way early at my ppl house," meaning he (DRUMMOND) was going to the Eugene Avenue area of Baltimore, where his (DRUMMOND's) mother resided at 5103 Eugene Avenue.

23.     On June 16, 2014, at 2302 hours, DRUMMOND, utilizing TT#4, sent an outgoing SMS message, captured in call session number 80, to 347-461-6763, which was utilized by KESS. In this SMS message, DRUMMOND told KESS not to use his current telephone number (TT #2)



and to "hit" the other phone, indicating that DRUMMOND was utilizing an additional telephone number to speak with his (DRUMMOND's) heroin source of supply. The SMS message is listed below:

DRUMMOND: "Dont hit dis phone hit other"

24.     On June 17, 2014, surveillance units noted that DRUMMOND traveled to 5103 Eugene Avenue, Raspeburg, Maryland in his 1998 blue Chevrolet Tahoe. After staying at Eugene Avenue for a short time, DRUMMOND left Eugene Avenue and traveled in his Tahoe to the area of Bel Air Road and Moravia Road, where he stopped in the Dollar General parking lot. While he sat in the parking lot of Dollar General, DRUMMOND was observed by surveillance units meeting with KESS, who was operating the same Honda Odyssey van he was stopped in on June 14, 2014. After a brief meeting, KESS and DRUMMOND left the area in separate directions. DRUMMOND returned to Eugene Avenue, Baltimore City for a short period of time, before returning back to the Caroline County, Maryland area. It is believed during this arranged meeting that DRUMMOND purchased approximately 150 grams of heroin from KESS. Additional surveillance was conducted on KESS as he navigated through the city, until the time that surveillance was terminated.

25.     On June 20, 2014, at 2336 hours, TT #2 was activated in call session number 6241. The activation was an incoming call from KESS, utilizing the telephone number 347-461-6763. During the conversation, DRUMMOND asked KESS if he had found any "joints" (pills). KESS explained to DRUMMOND that he hadn't, however, he (KESS) would continue to look for them.

26.     On June 22, 2014, at approximately 1429 hours, TT #2 was activated in call session number 6241. The activation was an incoming call from KESS, utilizing the telephone number

9

347-461-6763. During this conversation, KESS told DRUMMOND that he (KESS) had located

an amount of what KESS thought was 'thirties." DRUMMOND and KESS continued the

conversation back and forth about colors of pills and their inscriptions. KESS seemed confused

about prescription pills based on the colors and associated milligrams of each. KESS told

DRUMMOND that he would check with his source for the pills and verify they were in fact

thirties. Further transcription of call activation # 6241 is as follows:

> DRUMMOND: Yo.
>
> KESS: Yo I um sell dem things for you.
>
> DRUMMOND: Which ones?
>
> KESS: Thirties.
>
> DRUMMOND: Wats the number on em?
>
> KESS: I dont know I was thats why I was callin you see wats a good number on em.
>
> DRUMMOND: Like twenty or sometin.
>
> KESS: Aite didnt he say they got like thirty? What co...I think what they green or sometin?
>
> DRUMMOND: Them fifteens.
>
> KESS: Well let me see where he said it was thirt ummm what color dey is?
>
> DRUMMOND: [voices overlap] Red blue dey blue if dey fitteens.
>
> KESS: What color is?
>
> DRUMMOND: Thirtys.
>
> KESS: What color is?
>
> DRUMMOND: Thrirtys thirtys is blue fifteen is green.
>
> KESS: Aite let me see which one it is he said he had the thirtys doe.
>
> DRUMMOND: Aite.
>
> KESS: Ima call him back right now.
>
> DRUMMOND: Aite.
>
> KESS: Aite.
>
> [End of Call]

27.     On June 22, 2014, from 1444 to 1705 hours, TT#2 was activated with a SMS

conversation between DRUMMOND and KESS.  The call session numbers are: 6789, 6791,

6829, 6836, 6837, 6839, 6841 and 6846.  KESS told DRUMMOND that he had the "Puppy" for

him.  DRUMMOND told KESS he will get the "3's"when he met KESS the next day.  When

KESS referred to "Puppy", KESS was referring to heroin, which "Puppy" is street terminology

for heroin. DRUMMOND also refered to "3's", which is street terminology for a 30 milligram

prescription pill, being OXYCODONE/PERCOCET.  The SMS conversation is listed below in

consecutive order as they were initiated with the corresponding incoming and outgoing noted

with each SMS message:

> Incoming: "Hit me"
> Incoming: "Hit me"
> Incoming: "Hit me"
> Incoming: "Ur other phone actin crazy. I got that puppy 4 u"
> Outgoing: "I will get the 3s wen i cum get rite 2mar"
> Outgoing: "Got to get time"
> Outgoing: "Got to get time"
> Incoming: "K"

28.     On June 23, 2014, from 1140 to 1145 hours, TT#2 was activated with a SMS

conversation between DRUMMOND and KESS.  The call session numbers are: 7155, 7156,

7158, 7159 and 7161.  The SMS conversation is listed below in consecutive order as they were

initiated with the corresponding incoming and outgoing noted with each SMS message:

> Incoming: "K"
> Outgoing: "15"
> Incoming: "K"
> Outgoing: "No crazy talk on dis one hit u in a half on other joint. Ready go get time"
> Incoming: "K"



29.     On June 23, 2014, members of the Caroline County Drug Task Force and other law enforcement personnel started conducting surveillance on DRUMMOND, Joseph DEAN, Taylor GIBSON, and KESS.  On this day it was known, through the monitoring of TT#2, that DRUMMOND was to meet with his heroin source of supply, KESS.  However no specific time or location was discussed over TT #2.  The call activation numbers on TT #2 related to this June 23, 2014 meeting between KESS and DRUMMOND are 6241, 6784, 6789, 6791, 6829, 6836, 6837, 6839, 6841, 6846, 7155, 7156, 7158, 7159, and 7161. The further monitoring of TT #2 revealed that Joseph DEAN, Taylor GIBSON and DRUMMOND would be traveling across the Chesapeake Bay Bridge in DEAN's maroon 1999 Mercury Grand Marquis bearing Maryland registration 8MD3663.  At approximately 1655 hours surveillance agents observed DEAN operating the maroon Mercury from his residence located at 519 Franklin Street, Denton, MD. DEAN traveled directly to 10050 New Bridge Road, Denton, MD 21629.  From there, DEAN, DRUMMOND, and GIBSON traveled to Bargain Beverage located on Franklin Street in Denton, MD, to meet someone that DRUMMOND was going to sell a quantity of CDS, prior to leaving to meet KESS.  After meeting with the unknown male at Bargain Beverage, DEAN, DRUMMOND and GIBSON, left the area in the maroon Mercury and started west bound on Route 404.

30.     Additional surveillance support was acquired.  The maroon Mercury traveled from Denton, MD to the Severna Park area on Route 2, Anne Arundel County, MD.  DEAN, DRUMMOND, and GIBSON stopped at the Chic-Fil-a restaurant located at the intersection of MD Rt. 2 and Robinson Road in Severna Park, MD.  They were observed by law enforcement purchasing food in the drive through window before parking in the Chik-Fil-a parking lot and eating.  They remained parked at Chik-Fil-a for approximately 1.5 hours before moving to a

parking lot just south of the Chic Fil-a. While there, law enforcement observed DEAN leave the vehicle and enter the Game Stop retail store. He remained inside the store for a few moments before returning to the vehicle carrying a Game Stop shopping bag. After DEAN returned to the vehicle, DEAN, GIBSON, and DRUMMOND remained in the vehicle, parked in front of the Game Stop for approximately 1.5 hours before moving the vehicle to the McDonalds parking lot, at 2111 hours, located at the intersection of MD Rt. 2 and Baltimore-Annapolis Boulevard, in Severna Park, Anne Arundel County, MD. Surveillance units never lost sight of the vehicle after observing the three occupants leave Denton on Route 404.

31.     At approximately 2118 hours, KESS arrived at the McDonalds parking lot, where DRUMMOND, GIBSON and DEAN were parked. DRUMMOND exited the maroon Mercury and entered the passenger side of the Honda Odyssey Mini van that KESS was operating at 2119 hours. KESS drove around the McDonalds parking lot and at 2121 hours DRUMMOND exited KESS's vehicle and re-entered the maroon Mercury. Once DRUMMOND was back in the vehicle, the maroon Mercury left the McDonalds parking lot and headed south on Route 2 at 2122 hours. While surveillance units maintained surveillance on the maroon Mercury, other surveillance units continued to observe KESS as he traveled north on Route 2.

32.     Shortly after the meeting between DRUMMOND and KESS, Anne Arundel County Police Department conducted a traffic stop on KESS's vehicle on MD Rt. 10 just south of the exit for MD Rt. 710, Ordnance Road. KESS was stopped by the Anne Arundel County Narcotics unit for a traffic violation. Upon a positive alert by a K-9, KESS's vehicle was searched. As a result of the following items were located and seized: approximately 150 grams of pelletized heroin were located inside the Honda Odyssey van that KESS was operating when he was arrested. Also recovered was $6,370.50, packaged in Provident State Bank envelopes,



located inside the Honda Odyssey van that KESS was operating when he was arrested. Both the money and the suspected heroin were located together inside the vehicle. Additionally, four cellular phones, all of which were located on either KESS's person and/or in the Honda Odyssey van.

33.     KESS was subsequently arrested by the Anne Arundel County Narcotics unit and transported to their facility. KESS's van was seized as a result of the investigation and later transported to a secure location for storage pending the outcome of this investigation. KESS was charged with CDS possession-large amount, CDS possession with the intent to distribute (two counts), CDS possession-not marijuana (two counts). KESS was initially held on $375,000.00 bond, but later released after posting bail utilizing a bail bondsman.

34.     While KESS was being arrested, the maroon Mercury Grand Marquis occupied by DEAN (operator), DRUMMOND (front seat passenger) and GIBSON (rear right passenger) continued to travel en-route back to the eastern shore of Maryland. Surveillance was maintained on the maroon Mercury the entire time.

35.     Once DEAN entered the turn lane for Route 213 on Route 50, Wye Mills, Queen Anne County, MD, members of the Maryland State Police Fugitive Apprehension Unit and Gang Enforcement Unit conducted a felony stop on the maroon Mercury at 2156 hours. The stop was made at approximately 2158 hours. All occupants of the vehicle were detained.

36.     A systematic search of the 1999 maroon Mercury Grand Marquis revealed: one plastic bag containing approximately 82.2 grams (including plastic bag) of suspected pelletized heroin, seized from the right rear floor board. The plastic bag that the suspected heroin was packaged in was sent to the MSP Crime lab for latent print analysis. The suspected heroin was removed from its' original packaging for this purpose. One small plastic baggie containing 18 blue pills

inscribed "A 215", suspected Oxycodone, located and seized from DRUMMOND's front right

pants pocket. One Provident State Bank money envelope (identical to the ones in KESS'

vehicle) containing $6,373.00 U.S. Currency located and seized from the passenger side door

panel/pocket. Six blue pills inscribed "M 30", suspected Oxycodone.   Located and seized from

DRUMMOND's sock by Tfc. Logsdon #5279 of the Centreville barrack during a secondary

search. Four pills (3 blue inscribed "A 215" and 1 white inscribed "A 333"), suspected

Oxycodone, was seized from GIBSON's right breast/bra area by Deputy Kellog of the Queen

Anne County Sheriff's Office, during a secondary search at the MSP Centreville Barrack.

37.     A small portion of the heroin seized from both DRUMMOND  and KESS was later field

tested, producing a positive reaction for the presence of heroin, a schedule I, controlled

dangerous substance. As a result of this investigation investigators determined that KESS was

the main heroin source of supply to the DRUMMOND drug trafficking organization.

38.     On June 23, 2014, prior to the arrest of KESS, your affiant conducted surveillance of the

SUBJECT PREMISES and observed a 1994 Chevrolet Caprice with a Maryland Historic tag,

65739Z, parked at the SUBJECT PREMISES. In running the tag, your affiant learned the vehicle

was registered to KESS.

39.     On July 2, 2014, a search and seizure warrant was obtained on the four cellular devices

along with 25 other cellular devices seized during the course of this investigation. On July 3,

2014, the process had been initiated to extract the information from these cellular devices, to

include the devices seized from KESS.

40.     On July 3, 2014, search warrants authorized by the Circuit Court of Caroline County

Maryland were executed on the four cellular phones that were seized from KESS, subsequent to

his arrest on June 23, 2014, in Anne Arundel County Maryland. During the execution of these



warrants law enforcement identified numerous pictures and videos stored on the devices where KESS was posing with large amount of United States Currency. On a Samsung cellular Galaxy phone law enforcement identified videos dated June 13, 2014 and June 17, 2014, depicting KESS seated in the driver seat of a Honda Mini-van displaying multiple bundles of currency in his lap. Law Enforcement also identified 5 separate still pictures that were captured by KESS's phone on June 13, 2014, June 17, 2014, and June 19, 2014. In all of these pictures it can been seen what appears to be KESS's hand holding multiple bundles of currency while seated in the driver seat of a Honda Mini-van. It should be noted that the pictures taken on June 17, 2014, which was one of the days that KESS was observed meeting with DRUMMOND for the purpose of selling heroin to DRUMMOND. Also depicted on KESS' phone were photos of the 1994 Chevrolet Caprice that had been observed parked at the "SUBJECT PREMISES" on June 23, 2014.

41.     On June 18, 2014, the Caroline County Drug Task Force obtained a pen register with cell site location from the Circuit Court of Caroline County for the phone number 347-461-6763. This number was known, through investigation, to be utilized by KESS at the time of the court order. The pen register with cell site location for this phone number was active from June 18, 2014, until June 23, 2014, when KESS was arrested and the phone utilizing this number was seized from KESS's possession. During the five days this register was active there was 385 total contacts, 57 of which were utilizing the North Sector, or Sector 1, of the cell tower operated by NEXTEL Communications, located at the Global Positioning System (GPS) Coordinates, Latitude 39.438, Longitude -76,805. This position is approximately located at 11416 Reisterstown Road, Owings Mills, MD 2117. The approximate GPS Coordinates for the



SUBJECT PREMISES is Latitude 39.438, Longitude -76.806, and is approximately 2,946 feet from the tower.

42.    Cell towers, such as this one, have three sectors each covering 120 degrees each, totaling 360 degrees. The Northern sector or Sector 1 of the cell tower typically is responsible for the arc of bearing from 300 degrees to 060 degrees on a compass, thus encompassing 60 degrees on either side of due North, or 000 degrees. The SUBJECT PREMISES has a compass bearing of 354 degrees from this tower. Based on the location of the tower and the SUBJECT PREMISES, and the information provided by the cellular service provider, the SUBJECT PREMISES falls almost directly in the middle of the coverage area for Sector 1 of the cell tower located at approximate address of 11416 Reisterstown Rd, Owings Mills, MD.

43.    Though analysis of the Pen Register data that was captured over the five days of the pen register, the 57 contacts, that utilized Sector 1 of the above mentioned tower, occurred during the hours of the day in which people are normally at home and not working. On June 19, 2014, at 0843 hours, this was the latest time in the morning that the cell phone was activated and utilizing Sector 1 of the above mentioned tower. On June 22, 2014, at 1534 hours this was the earliest time in the afternoon in which the cell phone was activated at utilized Sector 1 of the above mentioned tower.

44.    On June 23, 2014, your affiant, along with Sgt J. Smullen of the Maryland State Police, conducted a post arrest interview KESS. During this interview KESS stated that he was employed by a contract line painting company and drove a line painting vehicle that painted lines on highways and roadways throughout the State of Maryland. This type of employment is indicative of the sporadic cell site locations that were captured throughout the working day, placing the phone and KESS is various parts of the state during work hours. However, typically



the cell site locations indicate that KESS began and finished his day with the phone utilizing Sector 1 of the above mentioned cell tower.

45.    On July 17, 2014, your affiant conducted surveillance at the SUBJECT PREMISES, the known address of KESS and Tamiko TAYLOR.  Your affiant arrived at the location at approximately 1730 hours and parked in a position where the residence could be observed.

46.    At approximately 2002 hours, your affiant observed a black Nissan Maxima, bearing MD license plate 8BD9835, registered owner, Tamiko TAYLOR, at the SUBJECT PREMISES, 8 Falls Chapel Way Reisterstown, MD, arrive and park directly in front of the access path to the door of the residence marked as 8 Falls Chapel Way.  Your affiant observed that the vehicle was operated by KESS and TAYLOR was the passenger in the vehicle.  As KESS parked the vehicle, three juveniles emerged from the residence and retrieved ten to fifteen grocery bags from the trunk and backseat of the Nissan, while KESS and Taylor remained seated in the front seats.  The juveniles then carried the groceries inside of unit 8.  A few moments later, KESS and TAYLOR exited the vehicle and proceeded to the main entrance of the SUBJECT PREMISES and entered the residence through the main door.

47.    Also, on July 17, 2014, your affiant served a subpoena on  Verizon Telephone Service requesting the subscriber information for the phone number 410-526-0148, a phone number your affiant believed was associated with KESS.  On July 25, 2014, your affiant received a response from Verizon Legal Compliance confirming that the phone number subpoenaed was in fact a land line phone number and was subscribed to by Gary KESS at the address of 8 Falls Chapel Way, Reisterstown, MD 21136.  Verizon Legal Compliance also indicated that the account was current and active and the next billing cycle would end on August 10, 2014, and the account was opened prior to June 15, 2014.



III.   **The Subject Premises**

48.   Based on the information set forth elsewhere in this affidavit, including but not limited to: the cell site data, as set forth in ¶¶ 41-43, which established that the cell phone utilized by KESS, and subsequently seized from KESS at the time of his arrest, was located at/near the SUBJECT PREMISES; the land line telephone subscribed to by KESS at the SUBJECT PREMISES;  and physical surveillance of KESS at the SUBJECT PREMISES; as well as my training, experience, and participation in narcotics investigations, and my conversations with other law enforcement officers, there is probable cause to believe that the SUBJECT PREMISES is being used for the storage and distribution of narcotics proceeds, as well as documents associated with narcotic distribution.

49.   Based upon my training and experience and my participation in this and other narcotics investigations, as well as my conversations with other agents, I know the following:

   a.   Narcotics traffickers often maintain on hand large amounts of currency in order to maintain and finance their on-going narcotics business, as well as paraphernalia used in the manufacture, packaging, preparation, and weighing of illegal narcotics in preparation for trafficking, and narcotics traffickers maintain these items where they have ready access to it.

   b.   Narcotics traffickers often maintain financial records and financial instruments related to their narcotics transactions and the profits derived from those transactions including, but not limited to, currency, bank checks, cashier's checks, Western Union receipts, money orders, stocks, bonds, precious metals, and real estate records;

   c.   Narcotics traffickers frequently maintain records of their narcotics transactions including, but not limited to, books, ledgers, records and other documents relating to the



manufacture, transportation, possession, and distribution of controlled substances. Such documents are frequently maintained where the traffickers have ready access to them, including in their homes and vehicles;

d.      Narcotics traffickers commonly maintain books, records and other documents that identify and contain the names, addresses and/or telephone or pager numbers of associates in their narcotics-trafficking or money-laundering activities, including, but not limited to: address books, telephone books, rolodexes, telephones, pagers, or personal digital assistants with stored telephone information, notes reflecting telephone and pager numbers, photographs (to include still photos, negatives, movies, slides, video tapes, and undeveloped film), and audiotape recordings of conversations, including those made over telephone answering machines. These individuals often utilize telephones, cellular telephones and other portable electronic devices to maintain contact with other associates of their illegal businesses, and telephone records, bills and electronic devices are often found in their places of residence, or the residences of family members, friends or associates, in their business locations, or in places used by drug traffickers to conduct their drug distribution activity, such as stash houses, leased storage facilities or safe houses;

e.      Narcotics traffickers commonly maintain identification and travel documents, including, but not limited to, tickets, transportation schedules, passports, notes and receipts related to travel, and motel/hotel receipts;

f.      Indicia of occupancy, residency and/or ownership of the premises to be searched are often present in such premises;



g.      Narcotics traffickers commonly maintain many of the foregoing items in computer files; and

h.      Narcotics traffickers commonly maintain the foregoing items inside combination or key-lock safes or strong boxes, suitcases, locked cabinets and other types of locked or closed containers, or hidden compartments, which are secreted in locations such as the SUBJECT PREMISES, where they may maintain these items securely.

50.    The SUBJECT PREMISES is described as a two-story multi-unit building with a brick front and two tone tan vinyl siding on the sides with red shutters; located at the intersection of Falls Chapel Way and Ridgelawn Road in Reisterstown, Maryland. Unit 8 is on the lower level of the north east corner of the building. There is a concrete path leading from Falls Chapel Way to the primary entrance of unit 8. Unit 8 has a small covered landing which has two white pillars supporting a small A-framed overhang. The primary entry has a white storm door with a center glass portion and behind the storm door is a white exterior door. Unit 8 is identified by a black number 8 affixed in the center of the overhang between the two white pillars.

**IV. Conclusion**

51.    Based upon the Title III intercepts, surveillances, and other investigations discussed above, I respectfully submit that there is probable cause to believe that there will be found at the SUBJECT PREMISES of 8 Falls Chapel Way Reisterstown, Maryland, Baltimore County, the items set forth in Attachment B, which constitute evidence, fruits and/or instrumentalities of violations of Title 21, United States Code, Sections 841 and 846, which prohibit the distribution,



14-1700SAG

possession with the intent to distribute and conspiracy to distribute and possess with the intent to

distribute controlled substances.

Special Agent Brian J. Pruitt
Homeland Security Investigations


Sworn to before me this 30 day of July, 2014

Stephanie A. Gallagher
United States Magistrate Judge

22

## ATTACHMENT B

A.    Books, records, receipts, notes, ledgers and other papers relating to the transportation, ordering, purchasing and distribution of controlled substances, in particular, Heroin, Cocaine base, Cocaine HCL, MDMA and Marijuana and records revealing relationships between organization members

B.    Books, records, receipts, bank statements and records, passbooks, letters of credit, money orders and cashiers' checks, safe deposit keys, items of storage such as safes and lock boxes, international money wires/transfers and other items evidencing the obtaining, secreting, transfer, concealment and/or the expenditure of money.

C.    Address and/or telephone books, any papers reflecting names, addresses, telephone numbers or pager numbers indicating relationships among the listed co-conspirators in the affidavit which are associated with the dealing of illegal controlled substances.

D.    United States currency, precious metals, jewelry and financial instruments.

E.    Photographs, in particular, photographs of co-conspirators, of assets, firearms and/or controlled substances.

F.    Indicia of occupancy, residency, and ownership of the premises described in said affidavit, including, but not limited to, utility and telephone bills, canceled envelopes, and keys.

G.    Cellular phones.

H.    Travel records, including but not limited to: passports, visas, airline tickets, boarding passes, and airline ticket receipts.